UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

DAWN MARIE STOVER,

               Plaintiff,

    -v-

ANDREW SAUL,
Commissioner of Social Security,[1]

               Defendant.

18-CV-00404-MJR
DECISION AND ORDER

Pursuant to 28 U.S.C. §636(c), the parties consented to have a United States Magistrate Judge conduct all proceedings in this case. (Dkt. No. 21)

Plaintiff Dawn Marie Stover ("plaintiff") brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner" or "defendant") denying her Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the following reasons, plaintiff's motion (Dkt. No. 12) is denied and defendant's motion (Dkt. No. 19) is granted.

## BACKGROUND

Plaintiff filed an application for DIB on December 5, 2011 alleging disability since November 1, 2008 due to arthritis in all joints and feet, sleep apnea, headaches, neck problems, high blood pressure and high cholesterol.[2] (See Tr. 100-20, 139)[3] Plaintiff's

---

[1] Andrew Saul is now the Commissioner of Social Security and is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d).

[2] Plaintiff also protectively filed an application for SSI on December 30, 2011.

[3] References to "Tr." are to the administrative record in this case.

disability benefits application was initially denied on March 16, 2012. (Tr. 55-58) Following an administrative hearing and an appeal to the Appeal's Council, plaintiff's claim was denied. (Tr. 5-7) Plaintiff appealed the denial to the Western District of New York ("Western District"). (Tr. 379) On November 5, 2014, the Western District reversed the denial and remanded the case to the Commissioner for further administrative proceeding. (*Id.*) The Appeals Council then remanded the matter to an administrative law judge for another hearing and additional development of the record. (Tr. 380-84) A video hearing was held before Administrative Law Judge ("ALJ") William Weir on August 11, 2017. (Tr. 363, 779-824) Plaintiff, who was represented by counsel, testified at the hearing. (*Id.*) ALJ Weir also received testimony from Vocational Examiner ("VE") Rachel Duchon. (*Id.*) On January 17, 2018, ALJ Weir issued a decision finding that plaintiff's condition did not meet the standard for disability as defined in the Act between her alleged onset date of November 1, 2008 through January 1, 2018. (Tr. 363-75) The ALJ then noted that on January 1, 2018, plaintiff's age category changed and, at that time, the medical-vocational guidelines directed a finding of disability. (*Id.*) The ALJ's denial of benefits for the period between November 1, 2008 and January 1, 2018 became the Commissioner's final determination when plaintiff appealed that determination directly to the Western District. (Tr. 358-60)

Born on January 2, 1968, plaintiff was forty years old on her alleged onset date. (Tr. 101, 787) She has a high school education and a past work history that includes home health aide and cashier. (Tr. 27-29, 99-148, 152, 165-186, 366, 446-454)

# DISCUSSION

I.  *Scope of Judicial Review*

The Court's review of the Commissioner's decision is deferential. Under the Act, the Commissioner's factual determinations "shall be conclusive" so long as they are "supported by substantial evidence," 42 U.S.C. §405(g), that is, supported by "such relevant evidence as a reasonable mind might accept as adequate to support [the] conclusion," *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks and citation omitted). "The substantial evidence test applies not only to findings on basic evidentiary facts, but also to inferences and conclusions drawn from the facts." *Smith v. Colvin*, 17 F. Supp. 3d 260, 264 (W.D.N.Y. 2014). "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force," the Court may "not substitute [its] judgment for that of the Commissioner." *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002). Thus, the Court's task is to ask "'whether the record, read as a whole, yields such evidence as would allow a reasonable mind to accept the conclusions reached' by the Commissioner." *Silvers v. Colvin*, 67 F. Supp. 3d 570, 574 (W.D.N.Y. 2014) (*quoting Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982)).

Two related rules follow from the Act's standard of review. The first is that "[i]t is the function of the [Commissioner], not [the Court], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983). The second rule is that "[g]enuine conflicts in the medical evidence are for the Commissioner to resolve." *Veino*, 312 F.3d at 588. While the applicable standard of review is deferential, this does not mean that the Commissioner's decision is presumptively correct. The Commissioner's decision is, as

described above, subject to remand or reversal if the factual conclusions on which it is based are not supported by substantial evidence. Further, the Commissioner's factual conclusions must be applied to the correct legal standard. *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). Failure to apply the correct legal standard is reversible error. *Id.*

II.    *Standards for Determining "Disability" Under the Act*

A "disability" is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). The Commissioner may find the claimant disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." *Id.* §423(d)(2)(A). The Commissioner must make these determinations based on "objective medical facts, diagnoses or medical opinions based on these facts, subjective evidence of pain or disability, and . . . [the claimant's] educational background, age, and work experience." *Dumas v. Schweiker*, 712 F.2d 1545, 1550 (2d Cir. 1983) (first alteration in original) (*quoting Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981)).

To guide the assessment of whether a claimant is disabled, the Commissioner has promulgated a "five-step sequential evaluation process." 20 C.F.R. §404.1520(a)(4). First, the Commissioner determines whether the claimant is "working" and whether that

4

work "is substantial gainful activity." *Id.* §404.1520(b). If the claimant is engaged in substantial gainful activity, the claimant is "not disabled regardless of [his or her] medical condition or . . . age, education, and work experience." *Id.* Second, if the claimant is not engaged in substantial gainful activity, the Commissioner asks whether the claimant has a "severe impairment." *Id.* §404.1520(c). To make this determination, the Commissioner asks whether the claimant has "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." *Id.* As with the first step, if the claimant does not have a severe impairment, he or she is not disabled regardless of any other factors or considerations. *Id.* Third, if the claimant does have a severe impairment, the Commissioner asks two additional questions: first, whether that severe impairment meets the Act's duration requirement, and second, whether the severe impairment is either listed in Appendix 1 of the Commissioner's regulations or is "equal to" an impairment listed in Appendix 1. *Id.* §404.1520(d). If the claimant satisfies both requirements of step three, the Commissioner will find that he or she is disabled without regard to his or her age, education, and work experience. *Id.*

If the claimant does not have the severe impairment required by step three, the Commissioner's analysis proceeds to steps four and five. Before doing so, the Commissioner must "assess and make a finding about [the claimant's] residual functional capacity ["RFC"] based on all the relevant medical and other evidence" in the record. *Id.* §404.1520(e). RFC "is the most [the claimant] can still do despite [his or her] limitations." *Id.* §404.1545(a)(1). The Commissioner's assessment of the claimant's RFC is then applied at steps four and five. At step four, the Commissioner "compare[s] [the] residual functional capacity assessment . . . with the physical and mental demands of [the

5

claimant's] past relevant work." *Id.* §404.1520(f). If, based on that comparison, the claimant is able to perform his or her past relevant work, the Commissioner will find that the claimant is not disabled within the meaning of the Act. *Id.* Finally, if the claimant cannot perform his or her past relevant work or does not have any past relevant work, then at the fifth step the Commissioner considers whether, based on the claimant's RFC, age, education, and work experience, the claimant "can make an adjustment to other work." *Id.* §404.1520(g)(1). If the claimant can adjust to other work, he or she is not disabled. *Id.* If, however, the claimant cannot adjust to other work, he or she is disabled within the meaning of the Act. *Id.*

The burden through steps one through four described above rests on the claimant. If the claimant carries their burden through the first four steps, "the burden then shifts to the [Commissioner] to show there is other gainful work in the national economy which the claimant could perform." *Carroll*, 705 F.2d at 642.

III.    *The ALJ's Decision*

The ALJ first found that plaintiff met the insured status requirements of the Act through September 30, 2011. (Tr. 366) The ALJ then followed the required five-step analysis for evaluating plaintiff's claim. Under step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset date of November 1, 2008. (*Id.*) At step two, the ALJ found that plaintiff had the severe impairments of osteoarthrosis, status post-bilateral total knee replacement, and obesity. (*Id.*) At step three, the ALJ determined that plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.

(Tr. 366-67)  Before proceeding to step four, the ALJ assessed plaintiff's RFC since November 1, 2008 as follows:

> [T]he [plaintiff] has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the [plaintiff] must be able to sit and stand at will, defined as every 45 minutes.  The [plaintiff] can incidentally squat, kneel, crouch or crawl.

(Tr. 367)

Proceeding to step four, the ALJ concluded that plaintiff is not capable of performing her past relevant work.  (Tr. 373)  The ALJ then noted that prior to the alleged disability onset date of November 1, 2008 and through January 1, 2018, plaintiff was a younger individual pursuant to Rule 201.14 of the medical-vocational guidelines.  (*Id.*)  The ALJ went on to find that from November 1, 2008 through January 1, 2018, there were jobs that existed in significant numbers in the national economy that plaintiff could have performed, such as final assembler and food order clerk.  (*Id.*)  In reaching this conclusion, the ALJ considered plaintiff's age, education, work experience, and RFC, as well as the testimony of the VE.[4]  (Tr. 374)  The ALJ then found that on January 1, 2018, plaintiff's age category changed to an individual closely approaching advanced age.  (*Id.*)  The ALJ then considered plaintiff's age after January 1, 2018, as well as her education, work experience and RFC, and concluded that there were no jobs that exist in significant numbers in the national economy that plaintiff could perform.  (*Id.*)  In summary, the ALJ found that plaintiff was not disabled from her alleged onset date of November 1, 2008 through December 31, 2017.  (Id.)  However, she became disabled when her age

---

[4] The ALJ noted that the VE's testimony is consistent with information contained in the Dictionary of Occupational Titles ("DOT"), except that the DOT does not address sit/stand requirements.  (Tr. 374)  However, the VE testified based upon her training, professional experience, and experience with the jobs described. (*Id.*)

category changed on January 1, 2018, and she continued to be disabled through January 17, 2018, the date of his decision. (*Id.*)

Thus, the issue before the Court is whether substantial evidence supports the finding that plaintiff was not disabled from her alleged onset date of November 1, 2008 through January 1, 2018, the date that ALJ Weir determined that she met the medical-vocational guidelines for a finding of disability under the Act.

IV.    *Plaintiff's Challenges*

Plaintiff argues that the RFC is not supported by substantial evidence because ALJ Weir failed to properly evaluate the opinion of treating physician Sridhar Rachala, MD. (*See* Dkt. No. 12-1 (Plaintiff's Memo. of Law)). Plaintiff contends that the ALJ erroneously ignored Dr. Rachala's findings that plaintiff required a parking permit, cane, walker, tub bench, and should do activity as tolerated, which suggest more restrictive limitations and more off-task time than afforded by the RFC. For the following reasons, the Court finds that the ALJ did not err in his evaluation of Dr. Rachala's opinion and treatment notes.

From November 2014 to June 2017, plaintiff treated with Dr. Rachala, at UB Orthopedics and Sports Medicine, for pain and swelling in both knees. (Tr. 476-500, 592-678) On November 3, 2014, Dr. Rachala diagnosed plaintiff with moderate to severe right knee osteoarthritis and bilateral knee degenerative disease, right worse than left, as well as morbid obesity. (Tr. 497-98) Dr. Rachala advised plaintiff to lose weight before undergoing knee replacement surgery, and specifically indicated that plaintiff should consider bariatric surgery for weight loss. (*Id.*) Plaintiff proceeded to have gastric bypass surgery and lose forty pounds, and saw Dr. Rachala again on February 29, 2016. (Tr. 596) At that time, plaintiff complained of knee pain and an x-ray revealed severe

osteoarthritis of the right knee. (Tr. 596-97) However, plaintiff was not in acute distress, was in a good mood and her knee was stable. (*Id.*) She refused a steroid injection. (*Id.*) Dr. Rachala advised plaintiff to continue with nonoperative treatment for another six months. (*Id.*) At an appointment with Dr. Rachala on October 17, 2016, plaintiff continued to complain of knee pain and swelling. (Tr. 602-10) Dr. Rachala diagnosed plaintiff with severe bilateral osteoarthritis of the knees and discussed further treatment options, including total knee replacement surgery. (*Id.*) At that time, plaintiff represented that she could walk around the house, go outside at will, and walk one to two blocks at a time. (Tr. 604)

Plaintiff underwent total knee replacement surgery on January 16, 2017. (Tr. 628-30) On January 30, 2017, plaintiff was found to be doing well post-surgery and an x-ray on that date revealed stable uncemented bilateral total knee arthroscopy with good alignment. (Tr. 649-54) On February 16, 2017, Dr. Rachala completed a temporary application for parking permit for persons with disabilities on behalf of plaintiff. (Tr. 655) On the application, Dr. Rachala indicated that plaintiff had a temporary disability as a result of a bilateral total knee replacement that was expected to end in approximately six months, on August 16, 2017. (*Id.*) The application also indicated that plaintiff used a cane. (*Id.*) During a February 27, 2017 appointment with Dr. Rachala, plaintiff reported that her health was fair and that she was not limited in daily activities like pushing a vacuum or climbing stairs. (Tr. 656-58) Dr. Rachala noted that plaintiff was doing well and that the knee components were in good position. (*Id.*) Plaintiff was instructed to bear weight on her knees as tolerated and to work on aggressive stretching and range of motion. (*Id.*) On March 31, 2017, plaintiff reported that her knees were 60% improved

and that she was able to stand for five minutes and ambulate for ten minutes. (Tr. 670-71) Plaintiff was examined on June 19, 2017 and found to have well-healed surgical sites, range of motion between 0 to 95 degrees and stability. (Tr. 672-73) Dr. Rachala's treatment notes indicated that plaintiff was using a walker at that time. (*Id.*) Plaintiff was instructed to continue with aggressive stretching and weightbearing as tolerated. (*Id.*)

In his decision, the ALJ provides a detailed discussion of plaintiff's treatment with Dr. Rachala, including most of the information noted above. It is clear from this discussion that the ALJ fully considered the information in Dr. Rachala's treatment notes in fashioning the RFC. (Tr. 369-72) Contrary to plaintiff's argument, the RFC is consistent with Dr. Rachala's medical findings. Here, the ALJ found that plaintiff had an RFC of sedentary work except that plaintiff must be able to sit and stand at will every 45 minutes and could incidentally squat, kneel, crouch or crawl.[5] Dr. Rachala's treatment notes reflect that plaintiff had osteoarthritis in her knees which caused some pain, and that plaintiff had a successful total knee replacement surgery from which she recovered well. Following the surgery, plaintiff's knees were stable with good range of motion. She was instructed to bear weight as tolerated and continue aggressive stretching. Dr. Rachala's notes do not reflect functional limitations greater than what is contained in the RFC. Indeed, while there is evidence in the record that plaintiff periodically used a cane for ambulation and used a walker when recovering from knee surgery, there is nothing in Dr. Rachala's notes, or in the record as a whole, to indicate that these devices were medically

---

[5] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. §404.1567(a).

necessary, prescribed by a physician or used for a prolonged period.[6] *See Caridad H. v. Comm'r of Soc. Sec.*, 5:18-CV-893, 2019 U.S. Dist. LEXIS 120313, *15-17 (NDNY July 19, 2019) (Plaintiff has the burden of demonstrating that an assistive device is medically necessary and "[a] physician's observation that a patient used a cane or had an unsteady gait does not satisfy this burden."); *Miller v. Astrue*, 538 F. Supp. 2d 641, 651 n.4 (SDNY 2008) (where there was no evidence that plaintiff required a cane at all times and where treating physicians did not opine that she was required to use a cane, plaintiff's use of a cane did not factor into finding her able to perform sedentary work). Further, the use of a cane or walker to aid in ambulation is not inconsistent with an RFC of sedentary work. This is especially true here, where there is evidence in the record that plaintiff was able to walk several blocks before the surgery as well as ambulate for up to ten minutes after the surgery. *See Zeler v. Comm'r of Soc. Sec.*, 1:17-CV-99, 2019 U.S. Dist. LEXIS 7877, *7-8 (WDNY Jan. 16, 2019) ("[T]he Commissioner has correctly pointed out that the finding of sedentary work is consistent with the use of a cane for walking that is a minor part of job duties."); *Podolsky v. Colvin*, 12 Civ. 6544, 2013 U.S. Dist. 138602, *46-48 (SDNY Sept. 26, 2013) (where plaintiff used a cane for prolonged ambulation because of impairment to the left knee, there was substantial evidence in the record for the ALJ to conclude that plaintiff could perform sedentary work). Likewise, there is nothing contained in Dr. Rachala's treatment notes to indicate that plaintiff was unable to sit for forty-five minutes at a time, or which would suggest that plaintiff needed more "off-task" time than contemplated by the RFC.

---

[6] Plaintiff testified during the hearing that she was not prescribed a cane but instead obtained one on her own. (Tr. 797)

The Court also finds that the ALJ did not err when he discounted Dr. Rachala's opinion, in the application for a parking permit for persons with disabilities, that plaintiff suffered from a "temporary disability." (Tr. 372) The ALJ properly gave little weight to this conclusory opinion because it was non-specific and addressed an issue reserved to the Commissioner. *See Williams v. Comm'r of Soc. Sec.*, 423 F. Supp. 2d 77 (WDNY 2006) ("A treating source's statement that a plaintiff is 'disabled,' however, is not considered a 'medical opinion' under the treating physician's rule, and is not entitled to controlling weight because it represents an opinion on an issue reserved to the Commissioner."); 20 C.F.R. §404.1527(d)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that [the Commissioner] will determine that you are disabled.") Moreover, even if the ALJ had credited Dr. Rachala's statements in the parking permit application, those statements would have been insufficient to render a finding of disability under the Act. Indeed, Dr. Rachala indicated that plaintiff's disability was temporary and expected to resolve in six months. *See* 20 C.F.R. §404.1505 ("The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment...which has lasted or can be expected to last for a continuous period of not less than twelve months.")

The Court also rejects plaintiff's argument that the ALJ had an affirmative duty to seek further information from Dr. Rachala, including a functional assessment. The evidence here consisted of extensive treatment records from Dr. Rachala and other treating physicians spanning 2008 through 2017, as well as a functional assessment by Dr. Sandra Boehlert. The ALJ considered the totality of this information and properly weighed the evidence. The medical findings are consistent with the RFC. Where, like

12

here, there are no "obvious gaps" in the record, an ALJ is not required to seek further information. *Rosa v. Callahan*, 168 F.3d 72, 79 n. 5 (2d Cir. 1999). *See also Tatelman v. Colvin*, 296 F. Supp. 3d 608, 612 (WDNY 2017) (When "evidence in hand is consistent and sufficient to determine whether a claimant is disabled, further development of the record is unnecessary.")

Plaintiff next argues that the RFC is not supported by substantial evidence because ALJ Weir improperly relied on a vague and incomplete 2012 opinion of consultative examiner Dr. Sandra Boehlert. (*See* Dkt. No. 12-1 (Plaintiff's Memo. of Law)). The Court disagrees.

On February 24, 2012, plaintiff was referred to Dr. Boehlert by the Division of Disability Determination for an orthopedic examination. (Tr. 241-44) At that time, plaintiff reported occasional low back pain, hip pain and knee pain as a result of arthritis and fluid in her knees. (*Id.*) Plaintiff indicated that she could cook, clean, shop, do laundry and engage in childcare as needed with breaks in between chores that sometimes included naps. (*Id.*) She reported engaging in self-care daily and that she could watch television, listen to the radio, socialize with friends, play bingo and complete puzzle books. (*Id.*) Following a physical examination, Dr. Boehlert found that plaintiff was in no acute distress, her gait was normal, that she could walk on her heels without difficulty and that toe-walking caused pain. (*Id.*) Plaintiff did not use an assistive device, was able to rise from a chair without difficulty and did not need assistance getting on or off the examining table. (*Id.*) She had full range of motion in her hips, knees and ankles bilaterally. (*Id.*) Plaintiff's strength was five out of five bilaterally and there was no muscle atrophy, joint effusion, inflammation or instability. (*Id.*) Dr. Boehlert opined that plaintiff had mild

13

limitations to heavy ambulation and repetitive squatting, heavy bending and twisting of lumbar spine, or exertional activity. (*Id.*) The Court finds that Dr. Boehlert's opinion is not vague and is consistent with the ALJ's assessment that plaintiff could engage in sedentary work with the ability to sit or stand every 45 minutes and only incidentally squat, kneel, crouch or crawl. *See De Rosia v. Colvin*, 16-CV-609, 2017 U.S. Dist. LEXIS 149272, *63-64 (WDNY Sept. 14, 2017) (moderate to marked limitation for prolonged standing and walking, as well as stair climbing and kneeling, are consistent with the ability to perform the exertional requirements of sedentary work with some additional modifications); *Sligh v. Astrue*, 09 CV 3507, 2011 U.S. Dist. LEXIS 110835, *28-29 (EDNY Sept. 28, 2011)(mild limitations in standing/walking, bending of the left knee, flexing of the left shoulder and lifting/carrying was consistent with sedentary work); *Corson v. Astrue*, 601 F. Supp. 2d 515 (WDNY 2009) (moderate limitations in walking, standing and climbing was consistent with the ability to perform a full range of sedentary work); *Lewis v. Colvin*, 548 Fed. Appx. 675, 678 (2d Cir. 2013) (an ALJ's determination that plaintiff could perform light work was supported by an assessment of mild limitations for prolonged sitting, standing and walking and instruction that plaintiff should avoid heavy lifting and carrying).

Further, Dr. Boehlert's assessment is consistent with and supported by the other medical evidence in the record. Plaintiff first complained of bilateral hip and knee pain in February 2009 but was in no acute distress and the examination findings were normal. (Tr. 369) At an appointment with Omega Family Medicine on August 2, 2011, plaintiff complained of joint pain in both knees that was aggravated by squatting, standing more than ten minutes and walking. (Tr. 693) She indicated that the pain was moderately

relieved through medication and that she was not presently working, but not because of joint pain. (*Id.*) An exam revealed joint tenderness in both knees but full range of motion bilaterally. (*Id.*) Plaintiff was advised to increase exercise. (*Id.*) During an exam on February 15, 2012, plaintiff complained of left knee pain that was present for one day. (Tr. 413) She was found to have normal muscle tone and full range of motion. (*Id.*) X-rays dated February 24, 2012 revealed mild to moderate degenerative changes in her left knee and a normal lumbar spine. (Tr. 243) On March 22, 2012, plaintiff reported pain and swelling in her right knee as a result of rising from a deep chair and walking. (Tr. 316-18) At that time, plaintiff was found to have a normal gait, full range of motion bilaterally, and no instability in her right knee. (*Id.*) Plaintiff attended eight physical therapy sessions in May and June of 2012. (Tr. 295-304) During those sessions, plaintiff reported no pain prior to the visits and improvement in her condition. (*Id.*) She did not report knee pain during visits with her primary care physician on May 7, 2012, August 7, 2012 and November 7, 2012, and examinations during those visits were normal. (Tr. 305-10, 319-20)

Beginning in the spring of 2012 and through August of 2014, plaintiff intermittently received treatment from Dr. Mohaned A. Al-Humadi, an orthopedic, spine and sports medicine specialist at Olean Medical Group. (Tr. 328-32, 727-32, 743-49, 753-60) During her first visit on April 26, 2012, plaintiff described her knee pain as a 4 out of 10. (Tr. 331) Dr. Al-Humadi recommended that she treat with inflammatory medicines and physical therapy, as well as steroid injections if the pain became worse. (Tr. 331) Plaintiff received injections for right knee pain from Dr. Humadi in June and August of 2012 and again in

July of 2013. (Tr. 328-30, 743-49) On October 29, 2013, plaintiff reported that while she still had pain going up and down steps, her condition had generally improved. (Tr. 749)

Plaintiff reported bilateral knee pain during an appointment with her primary care physician on February 14, 2013. (Tr. 576-77) Her examination showed tenderness in her knees and a mildly decreased range of motion. (Id.) She was instructed to avoid heavy lifting, pushing or pulling. (Id.) During visits with her primary care doctor on March 14, 2013, May 14, 2013, August 28, 2013, and February 28, 2014, plaintiff was in no acute distress, did not complain of knee pain and her examination findings were generally normal. (Tr. 563, 571-75) Plaintiff returned to Dr. Humandi on March 24, 2014 and complained of knee pain with activity and range of motion. (Tr. 753-55) She was again given an injection. (Id.) During an appointment on May 20, 2014, plaintiff complained that she was still having pain despite the injections. (Tr. 758) On August 26, 2014, plaintiff reported to Dr. Humadi that she was having pain with activities of daily living, especially walking, and that she needed to use a cane for assistance. (Tr. 760) Dr. Humadi referred plaintiff to Dr. Rachala for elective knee replacement surgery. (Id.)

In sum, the medical evidence indicates that plaintiff did experience intermittent knee pain as a result of osteoarthritis that would have limited prolonged ambulation or other types of heavy exertional activities such as repeated bending, squatting, twisting and kneeling. However, none of the medical records from the relevant time period, including those dated after the 2012 consultative examination, indicate that plaintiff had greater functional limitations than those assessed by Dr. Boehlert. The Court rejects plaintiff's argument that Dr. Boehlert's opinion was incomplete because it did not take into account plaintiff's subsequent surgeries, including a hysterectomy, gastric bypass and

16

knee replacement. The record is devoid of evidence that these surgeries affected her ability to perform sedentary work. Indeed, plaintiff testified that gastric bypass surgery and knee replacement surgery did not change her conditions. (Tr. 799-80, 812) *See Carney v. Berryhill*, 16-CV-269, 2017 U.S. Dist. LEXIS 72784, *17-18 (WDNY May 12, 2017) (medical opinion not considered stale where there was no evidence that plaintiff's condition deteriorated after the opinion was rendered, and the opinion was consistent with the record as a whole); *Garber v. Astrue*, 1:10-CV-00845, 2012 U.S. Dist. 43845, *31-32 (NDNY March 2, 2012) (ALJ did not err by crediting medical opinion that did not take into account subsequent medical evidence where none of the records from the subsequent time period directly controverted the opinion).

Moreover, the functional limitations found by Dr. Boehlert, which are consistent with the performance of sedentary work with the ability to change positions, are supported by plaintiff's testimony and representations as to her own capabilities. Plaintiff testified that she left her last job as a home health aide because she was no longer able to kneel and lift patients, and instead wanted to work a "desk job". (Tr. 788) Plaintiff testified that she was given a walker after her knee replacement surgery and told to use it as needed, which was typically when she walked long distances. (Tr. 784) She testified that she was not prescribed a knee brace or cane, but that she obtained a cane on her own. (Tr. 797-98) Plaintiff testified that she did not renew her disability parking permit, despite being told to do so if she felt it was needed. (Tr. 793) Also during the hearing, plaintiff represented that she drives twice a week, cooks every day, and regularly visits with her children and grandchildren. (Tr. 793-96) Plaintiff explained that she is capable of washing dishes, vacuuming, picking up around the house and that she did not stop gardening until

a couple years ago. (*Id.*) During the consultative examination, plaintiff indicated that she completes self-care daily, does laundry, shops, socializes, watches television, listens to the radio, plays bingo and completes puzzle books. (Tr. 242-44) During medical appointments plaintiff reported exercising sporadically, attending a fair, and walking in the mall. (Tr. 371, 295, 579, 728)

Plaintiff next argues that ALJ Weir erred by failing to consider her degenerative lumbar and cervical spine disorders, gynecological or liver problems, hypertension, learning disabilities, and other conditions as severe or non-severe. (*See* Dkt. No. 12-1 (Plaintiff's Memo. of Law)). The Court rejects this argument and finds that any failure by the ALJ to consider these conditions, either as severe or non-severe, was harmless error.

At the second step of the sequential evaluation, the ALJ must determine the severity of a claimant's impairments. 20 C.F.R. §§404.1520(a)(4)(ii), (c). An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. *Jones-Reid v. Asture*, 934 F. Supp. 2d 381 (D. Conn. 2012). Impairments that are "not severe" must only be a slight abnormality that has a minimum effect on an individual's ability to perform basic work activities. *Id.* When assessing a plaintiff's RFC at step three of the sequential analysis, the ALJ is required to consider "all of plaintiff's medically determinable impairments of which [the ALJ was] aware, including [plaintiff's] medically determinable impairments that are not 'severe'." 20 CFR § 416.954. Thus, courts have held that an ALJ's failure to classify an impairment as severe is harmless error, provided the ALJ determines that at least one of the claimant's impairments is severe, and then continues with the remaining steps of the analysis. *Texidor v. Astrue*, 3:10-CV-701, 2011 U.S. Dist. LEXIS 158430 (D. Conn. April 11, 2011). *See also Jones-Reid*, 934 F. Supp.

at 401 ("A harmless error approach is consistent with the Second Circuit's finding that step two severity determinations are to be used only to screen out *de minimis* claims.") Here, the ALJ found, at step two of his analysis, that plaintiff had the severe impairments of osteoarthritis and obesity. He then continued with the remaining steps of the analysis. Thus, the ALJ's failure to classify plaintiff's spine problems, gynecological or liver conditions, hypertension and learning disabilities as severe or non-severe was harmless error. In accordance with his obligations to consider all of plaintiff's medically determinable impairments, regardless of severity, the ALJ specifically and correctly noted that none of plaintiff's treating providers offered any functional limitations more restrictive than the RFC. (Tr. 373)

Moreover, even if the ALJ wholly failed to consider these conditions in fashioning the RFC, the failure was also harmless error. While the medical records in evidence indicate that plaintiff periodically received treatment for gynecological issues, hypertension, spine pain, and other physical ailments, there is nothing in the record to indicate that these conditions would affect her ability to perform sedentary work with the additional restrictions contained in the RFC. For example, on March 13, 2012, a state agency reviewing physician opined that plaintiff had no medically determination mental impairment. (Tr. 372) Dr. Boehlert found that plaintiff had full motion in her cervical spine and 70 degrees flexion in her lumbar spine. (Tr. 242-43) During the hearing, plaintiff's counsel admitted that there was no nexus between plaintiff's hypertension and her functional limitations. (Tr. 809) *See e.g., Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) ("[W]here application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration."); *Salmini v. Comm'r*

of *Soc. Sec.*, 371 F. App'x 109, 112 (2d Cir. 2010) (Where an ALJ's decision does not include express reasons for particular findings, remand is not required if other portions of the decision and clearly credible evidence show that substantial evidence supports the determination.)

Finally, plaintiff argues that ALJ Weir failed to properly evaluate plaintiff's credibility as to her limitations and the severity of her symptoms. (*See* Dkt. No. 12-1 (Plaintiff's Memo. of Law)). The Court disagrees and finds that the ALJ thoroughly analyzed and assessed plaintiff's credibility.

It is well settled that it is the role of the ALJ, not the Court, to appraise the credibility of witnesses, including the plaintiff. *See Carroll v. Secretary of Health & Human Services*, 705 F.2d 638, 642 (2d Cir. 1983). "The ALJ is required to evaluate the credibility of testimony or statements about the claimant's impairments when there is conflicting evidence about the extent of pain, limitations of function, or other symptoms alleged." *Fisk v. Colvin*, No. 14-CV-931S, 2017 WL 1159730, at *5 (W.D.N.Y. Mar. 29, 2017). The Commissioner has set forth a two-step process to evaluate a plaintiff's testimony regarding her symptoms. First, the ALJ must consider whether the plaintiff has a medically determinable impairment which could reasonably be expected to produce the pain or other symptoms alleged by the plaintiff. Second, if the ALJ finds that the plaintiff is so impaired, he must then evaluate the intensity, persistence, and limiting effects of the plaintiff's symptoms. If the plaintiff's statements about her pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding as to the plaintiff's credibility by assessing the following factors: (1) the plaintiff's daily activities; (2) the location, duration, frequency, and intensity of the pain or other symptoms; (3)

precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain or other symptoms; (5) any treatment, other than medication, that the plaintiff has received; (6) any other measures that the plaintiff employs to relieve the pain or other symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain or other symptoms. *See* 20 C.F.R. §404.1529; Social Security Ruling ("SSR") 96-7P, 1996 WL 374186 (July 2, 1996); SSR 16-3P, 2017 WL 5180304 (Oct. 25, 2017).

Here, at the first step of the credibility analysis, the ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but at the second step, the ALJ found that plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms "are not fully supported." (Tr. 369-72). Contrary to plaintiff's argument, the ALJ's evaluation of her credibility complied with the applicable regulation and is supported by substantial evidence. *See Selian v. Astrue*, 708 F.3d 409, 420 (2d Cir. 2012) ("Because it is the function of the Commissioner and not the reviewing court to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant, the court will defer to the ALJ's determination as long as it is supported by substantial evidence.")

To begin, the ALJ specifically noted that plaintiff's physical complaints greatly exceeded the clinical findings during the relevant period. (Tr. 369) He explained that while plaintiff alleged that she experienced chronic knee pain since 2008, she received little medical treatment for her knee condition between 2008 and the start of 2012. (Tr. 369) The ALJ also recognized that plaintiff had few complaints of pain prior to 2012, inconsistent complaints after that and that she "did not appear to seek treatment with the

persistence of someone who was experiencing such severe pain." (Tr. 369) The ALJ noted that even after Dr. Al-Humadi instructed plaintiff to follow-up when she was ready for knee surgery, plaintiff waited a significant amount of time to undergo the procedure. (Tr. 369) After considering the medical records in detail, the ALJ concluded that the treatment notes did not reflect a serious or debilitating condition which would prevent plaintiff from performing sedentary work. (*Id.*)

The ALJ further noted that plaintiff's complaints of pain and limitations were not supported by other evidence in the record, including plaintiff's own statements and behavior. For instance, plaintiff indicated that she needed a cane and walker as well as a parking permit for persons with disabilities. However, she was only observed using the cane on two occasions and failed to renew the permit. (*Id.*) Further, plaintiff's testimony that her knee condition did not improve after surgery is belied by medical records that demonstrate an improvement in her knee condition shortly after the procedure. (*Id.*) The ALJ notes that during an appointment after the surgery plaintiff indicated that she was not limited at all in activities such as pushing a vacuum clean or climbing stairs. (Tr. 371)

The ALJ further found that plaintiff's acknowledged activities of daily living were inconsistent with her allegations of total disability. (Tr. 371) Plaintiff testified during the hearing that she is able to complete household chores, cook every day, and visit regularly with her children and grandchildren. (Tr. 371) The ALJ also pointed out that plaintiff admitted she is able to lose weight through diet and exercise and that she only stopped gardening a few years ago. (*Id.*) The ALJ noted that plaintiff told her medical providers that she exercises sporadically, can walk through the mall and go to a fair, and that she could walk one to two blocks. While plaintiff argues that the ALJ should have credited

22

her testimony that she was only able to sit for thirty minutes at a time and would spend more than 15 percent of time "off-task", the ALJ correctly found no evidence in the record, medical or otherwise, to support these statements. As acknowledged by the ALJ, the RFC is consistent with plaintiff's ability to sit and stand provided she can periodically change positions. Finally, the ALJ reviewed plaintiff's earning record and found that she did not have a consistent work history to demonstrate strong evidence of motivation to work. (Tr. 371, 451-52) *See Camille v. Colvin*, 104 F. Supp. 3d 329, 347 (WDNY 2015) (poor work history is a proper consideration in evaluating subjective complaints).

## CONCLUSION

For the foregoing reasons, plaintiff's motion for judgment on the pleadings (Dkt. No. 12) is denied and the Commissioner's motion for judgment on the pleadings (Dkt. No. 19) is granted.

The Clerk of Court shall take all steps necessary to close this case.

**SO ORDERED.**

Dated:      February 25, 2020
            Buffalo, New York


_____
MICHAEL J. ROEMER
United States Magistrate Judge

23